| | | |
|---|---|---|
| **CHARLES BARBER** | * | **IN THE** |
| 14100 McMullen Highway | | |
| SW Cumberland, Maryland 21502 | * | **CIRCUIT COURT** |
| | | |
|     **Plaintiff** | * | **FOR** |
| | | |
| **v.** | * | **HOWARD COUNTY** |
| | | |
| **LIONEL BURNETT** | * | |
| Jessup Correctional Institute | | |
| 7800 House of Correction Road | * | **Case No.:** |
| Jessup, Maryland  20794 | | |
| | * | |
| and | | |
| | * | |
| **OLUWASEGUN FASHAE** | | |
| Jessup Correctional Institute | * | |
| 7800 House of Correction Road | | |
| Jessup, Maryland  20794 | * | |
| | | |
| and | * | |
| | | |
| **PHILIPE JORDAN** | * | |
| Jessup Correctional Institute | | |
| 7800 House of Correction Road | * | |
| Jessup, Maryland  20794 | | |
| | * | |
| and | | |
| | * | |
| **MICHAEL GASKINS** | | |
| Jessup Correctional Institute | * | |
| 7800 House of Correction Road | | |
| Jessup, Maryland  20794 | | |
| | * | |
| and | | |
| | * | |
| **ALBERT OSEI-OSAFO** | | |
| Jessup Correctional Institute | * | |
| 7800 House of Correction Road | | |
| Jessup, Maryland  20794 | * | |
| | | |
| and | * | |

CIVIL LITIGATION DIVISION
RECEIVED
AUG 1 4 2020
Office of the Attorney General

**ADELE OLAKANYE**                          *
**Jessup Correctional Institute**
**7800 House of Correction Road**           *
**Jessup, Maryland  20794**
                                            *

and
                                            *

**OWOEDINYENE AKPAN**                       *
**Jessup Correctional Institute**
**7800 House of Correction Road**
**Jessup, Maryland  20794**                 *

and                                         *

**TAMARA RICE**                             *
**Jessup Correctional Institute**
**7800 House of Correction Road**           *
**Jessup, Maryland  20794**
                                            *

and                                         *

**TANYEAL GOODE**                           *
**Jessup Correctional Institute**
**7800 House of Correction Road**           *
**Jessup, Maryland  20794**

and                                         *

**WARREN WRIGHT**                           *
**Jessup Correctional Institute**
**7800 House of Correction Road**           *
**Jessup, Maryland  20794**
                                            *

and                                         *

**JOHN S. WOLFE**
**Jessup Correctional Institute**           *
**7800 House of Correction Road**
**Jessup, Maryland  20794**                 *

and                                         *

- 2 -

MARYLAND DEPARTMENT OF     *
PUBLIC SAFETY AND
CORRECTIONAL SERVICES     *
300 East Joppa Road, Suite 1000
Towson, Maryland 21286     *
SERVE: Brian Frosh, Attorney General
       Office of the Attorney General   *
       200 Saint Paul Place
       Baltimore, Maryland 21202   *

       and                       *

       Nancy K. Kopp, Treasurer    *
       Louis L. Goldstein Treasury Bldg.
       80 Calvert Street, Room 109   *
       Annapolis, Maryland 21401
                         *

Defendants
                              *

\*  \*  \*  \*  \*  \*      \*  \*  \*  \*  \*  \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Charles Barber, by and through his undersigned counsel, hereby files this Complaint against the Defendants, Lionel Burnett, Oluwasegun Fashae, Philip Jordan, Michael Gaskins, Albert Osei-Osafo, Adele Olakanye, Oweodinyene Akpan, Tamara Rice, Tanyeal Goode and Warren Wright (collectively hereinafter the "Correctional Officer Defendants"), Defendant John S. Wolfe ("Warden Wolfe," and together with the Correctional Officer Defendants, the "Individual Defeindants"), and Defendant Maryland Department of Public Safety and Correctional Services ("DPSCS"), and states in support:

## PARTIES

1.     Plaintiff, Charles Barber (hereinafter "Mr. Barber" or "Plaintiff"), is and was at all relevant times a citizen of the State of Maryland. At all relevant times, Mr. Barber was incarcerated at Jessup Correctional Institute ("JCI") which is located in Howard County, Maryland.

2.      JCI is a prison facility maintained by DPSCS, and is located at 7800 House of Correction Road, Jessup, Maryland 20794.

3.      On information and belief, Defendant Lionel Burnett ("Sergeant Burnett"), at all times relevant to this action, was employed by DPSCS as a sergeant at JCI.

4.      On information and belief, Defendant Oluwasegun Fashac ("Officer Fashae"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

5.      On information and belief, Defendant Phillipe Jordan ("Officer Jordan"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

6.      On information and belief, Defendant Michael Gaskins ("Officer Gaskins"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

7.      On information and belief, Defendant Albert Osei-Osafo ("Officer Osei-Osafo"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

8.      On information and belief, Defendant Adele Olakanye ("Officer Olakanye"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

9.      On information and belief, Defendant Owoedinyene Akpan ("Officer Akpan"), at all times relevant to this action, was employed by DPSCs as a Correctional Officer at JCI.

10.     On information and belief, Defendant Tamara Rice ("Officer Rice"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

11.     On information and belief, Defendant Warren Wright ("Officer Wright"), at all times relevant to this action, was employed by DPSCS as a Correctional Officer at JCI.

12.     On information and belief, Defendant Tanyeal Goode ("Lieutenant Goode"), at all times relevant to this action, was employed by DPSCS as a Lieutenant at JCI.

13.     On information and belief, Defendant John S. Wolfe ("Warden Wolfe"), at all times relevant to this action, was employed by DPSCS as the Warden of JCI.

14.     DPSCS, at all times relevant, through its departmental administrative entities and its agents, servants, and employees, operated and oversaw JCI.

15.     At all relevant times, the Individual Defendants were employees of DPSCS, and as such, were duly authorized state employees and agents, acting under the color of state law, and within the scope and course of their respective duties.

## JURSIDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter, pursuant to Maryland Code, Courts & Judicial Proceedings ("CJP") §§ 1-501 and 4-401, as the amount in controversy in this case exceeds Thirty Thousand Dollars ($30,000.00)..

17.     This Court has jurisdiction over DPSCS pursuant to Maryland Code, State Gov't ("SG") § 12-106 and CJP § 6-103.

18.     Venue is proper in this Court pursuant to CJP § 6-201, because all events complained of occurred at JCI, which is located in Howard County, Maryland.

19.     Mr. Barber has fully complied with the Maryland Tort Claims Act ("MTCA"), SG § 12-106, by sending written notice to the Maryland State Treasurer by certified mail, return receipt requested on April 18, 2018, within one year of the date of the injury.  Mr. Barber's Notice of Claim is attached hereto as **Exhibit A**.

20.     The State Treasurer's Office responded to Mr. Barber's written notice on May 3, 2018, advising Mr. Barber that he was permitted to pursue "any judicial remedies available" under the Maryland Tort Claims Act unless an amicable resolution was made within six months of the date of the letter.  To date, Mr. Barber's claims have not been resolved, nor has the Treasurer issues

a formal denial.  Pursuant to the MTCA, the Treasurer's failure to respond to Mr. Barber's Notice

of Claim within six months is deemed a final denial of that claim.  The State Treasurer's Office's

May 3, 2018 letter is attached hereto as **Exhibit B**.

### FACTS COMMON TO ALL COUNTS

21.      On the evening of April 23, 2017, at approximately 6:25 p.m., Officer Okafor  was

making the rounds in JCI's F Building to gather prisoners for their medication.

22.      Officer Okafor approached Cell 513 wherein Mr. Barber was housed.  Officer

Okafor was familiar with Mr. Barber.  In fact, Officer Okafor acknowledged knowing Mr. Barber

for approximately ten years and stated that he has never known Mr. Barber to be aggressive or

violent.

23.      As Mr. Barber emerged from his cell, he was concerned about other prisoners that

he knew were also due for their medication and repeatedly asked Officer Okafor to gather these

prisoners.  After Officer Okafor did not respond to Mr. Barber's requests, Mr. Barber and Officer

Okafor engaged in a physical altercation.

24.      In response to the altercation and in an effort to diffuse the situation, Officer Ajayi-

Philips administered pepper spray in Mr. Barber's direction.  At the same time, other officers,

identified as Defendants Olakanye, Wright, Fashae, and Burnett, approached the scene, handcuffed

Mr. Barber, and escorted him off of the housing tier.

25.      After the altercation, Lieutenant Goode instructed the officers to take Mr. Barber

through the Multi-Purpose Building and perform a strip search of Mr. Barber.  Mr. Barber was led

to a holding cell where he remained for approximately twenty minutes and was subsequently taken

to the medical unit.  After arriving in the medical unit, however, Mr. Barber received no medical

- 6 -

treatment and waited approximately five minutes before being led to Holding Cell 121 located in the adjacent Property Room.

26.     Mr. Barber did not know before entering Holding Cell 121 that he would not be alone. In fact, there were approximately ten correctional officers waiting for Mr. Barber to arrive. As he entered the holding cell, an officer instructed Mr. Barber to face the wall. Mr. Barber complied. Mr. Barber's handcuffs were then removed and he was instructed to turn around and face the ten waiting officers.

27.     As he turned around, the ten officers including Defendants Gaskins, Burnett, Fashae, Rice, Jordan, and Wright began to punch and kick Mr. Barber, taking turns in an effort to ensure that all officers were able to participate in this brutal attack. At one point, Mr. Barber heard Sergeant Burnett instruct the officers to avoid striking Mr. Barber in the face, presumably to conceal any over physical injuries. All the while, Lieutenant Goode stood by and watched the officers savagely beat Mr. Barber in an apparent retaliation for the altercation with Officer Okafor.

28.     After the officers were satisfied with their efforts, Mr. Barber's blood-soaked clothing—a pair of shorts and white t-shirt—were ripped from his body and tossed in a trashcan located right outside of the holding cell. The officers gave Mr. Barber clean clothing and then escorted him back to the medical unit.

29.     Upon arriving back to the medical unit, officers falsely informed the nurse on duty that Mr. Barber refused medical treatment for his injuries-injuries inflicted by those officers in the attack. In fact, Mr. Barber never refused medical treatment and asked for medical attention to help alleviate the pain caused by his injuries. Mr. Barber refused to sign the Release of Responsibility form presented to him by the nurse.

30.     Little did Mr. Barber know, Sergeant Burnett and two additional officers including Officer Fashae were not finished with him.  When Mr. Barber arrived in a new cell located in A Building, these three officers beat Mr. Barber once more.

31.     Upon investigation, Mr. Barber's bloody clothing was retrieved from the trashcan outside of the holding cell area by Detective Sergeant Balderston.  Notably, the bloodstains appeared to be fresh.  Upon further investigation, fresh blood was also found on the floor and walls of Holding Cell 121.

32.     Fortunately, video captured several of the officers disposing of Mr. Barber's bloody clothing.  Without such video, there would have been no other records to substantiate Mr. Barber's description of the event, as there were no other records and nothing recorded from Mr. Barber's time spent in the medical unit, and of course, the ten assailant officers did not admit to what they had done.  Absent this video, the attack on Mr. Barber would have been buried forever, like so many other prisoners who suffer similar abuses.

33.     On the evening of April 23, 2017, Detective Balderston reported the altercation between Mr. Barber and Officer Okafor to the DPSCS Internal Investigation Division ("IID"), which initiated a criminal investigation and subsequent report assigned as DPSCS-IID, Case No. 17-35-00815.  A copy of the DPSCS IID Report Summary is attached hereto as **Exhibit C**.[1]

34.     IID also conducted a separate administrative investigation into the Correctional Officer Defendants, labeled as IID, Case No. 12-35-00811.  IID has refused to produce this report, despite several requests for the same.

35.     On information and belief, the Correctional Officer Defendants have a previous history of extrajudicial punishment at JCI under Warden Wolfe's oversight.  However, the

---

[1] Notably, IID's investigation concluded with the correctional officers refusing to cooperate and IID declining to file criminal charges.  *See* Ex. C, at 4-5.

Correctional Officer Defendants were not properly disciplined, and were allowed to continue having prisoner contact.

36.     On information and belief, Warden Wolfe and DPSCS knew that the Correctional Officer Defendants had a history of retaliatory excessive force, but nevertheless failed to intervene or take steps to properly discipline those officers.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 – Excessive Force
### (Against Correctional Officer Defendants in their individual capacities)[2]

37.     Plaintiff hereby incorporates Paragraphs 1 through 36 as if fully set forth herein.

38.     The Correctional Officer Defendants' acts and omissions, as set forth herein, constituted conduct under color of state law that deprived Mr. Barber of rights, privileges, and immunities secured by the Constitution and the laws of the United States.

39.     As a direct and proximate result of the conduct alleged herein, the Correctional Officer Defendants deprived Mr. Barber of the following clearly established rights under the Eighth and Fourteenth Amendments of the United States Constitution, more specifically:  (a) the right to be free from the use of excessive and unreasonable force and seizure; (b) the right to be free from a deprivation of life and liberty without due process of law; (c) the right to be free from known risks of serious physical harm; (d) the right to be free from deliberate indifference for a serious medical need; and (e) the right to be free from objectively unreasonable conduct that causes, or has the potential to cause, constitutional harm.

---

[2] Additional Defendants may be identified after the benefit of discovery given the State of Maryland's refusal to produce all investigative reports.

40. Any reasonable correctional officer or supervisor knew or should have known of these rights at the time of the complained of conduct.

41. As a direct and proximate result of, the Correctional Officer Defendants' violations of Mr. Barber's constitutional rights as described herein, Mr. Barber suffered damages including, but not limited to, serious physical injuries, mental anguish, and emotional pain and suffering.

**WHEREFORE,** Mr. Barber prays for judgment in his favor against the Defendants, Burnett, Fashae, Jordan, Gaskins, Osei-Osafo, Olakanye, Akpan, Goode, Rice, and Wright, in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), plus costs, and such other relief which the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## COUNT II
### 42 U.S.C. § 1983 – Supervisory Liability
### (Against Warden Wolfe, in his individual capacity)[3]

42. Plaintiff hereby incorporates Paragraphs 1 through 41 as if fully set forth herein.

43. At all relevant times to this action, Warden Wolfe was an employee of the State of Maryland, acting within the scope of his employment as Warden Wolfe was responsible for overseeing the Correctional Officer Defendants and for maintaining a lawful environment at JCI.

44. As a direct and proximate result of the conduct alleged herein, Warden Wolfe, through his personal acts and failures to act, deprived Mr. Barber of the following clearly established rights under the Eighth and Fourteenth Amendments of the United States Constitution, more specifically: (a) the right to be free from the use of excessive and unreasonable force and seizure; (b) the right to be free from a deprivation of life and liberty without due process of law;

---

[3] Additional Defendants may be identified after the benefit of discovery given the State of Maryland's refusal to produce all investigative reports.

(c) the right to be free from known risks of serious physical harm; (d) the right to be free from deliberate indifference for a serious medical need; and (e) the right to be free from objectively unreasonable conduct that causes, or has the potential to cause, constitutional harm.

45.     Warden Wolfe personally violated Mr. Barber's rights because he, on information and belief, knew that the Correctional Officer Defendants were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to prisoners like Mr. Barber.  Warden Wolfe's response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of these practices.

46.     As a direct and proximate result of Warden Wolfe's violations of Mr. Barber's constitutional rights, Mr. Barber suffered damages including, but not limited to, serious physical injuries, mental anguish, and emotional pain and suffering.

**WHEREFORE,** Mr. Barber prays for judgment in his favor and against the Defendant, Warden Wolfe, in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), plus costs, and such other relief that the Court deems appropriate, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## COUNT III
### Excessive Force in Violation of the Maryland Declaration of Rights, Articles 16 & 25
### (Against All Defendants)

47.     Plaintiff hereby incorporates Paragraphs 1 through 46 as if fully set forth herein.

48.     The Correctional Officer Defendants were acting under the color of state law as officers and employees of the State, and their acts and/or omissions were conducted within the scope of their official duties and/or employment.

49.     At no time did Mr. Barber resist detention or attempt to evade detention by flight or otherwise.  In fact, at all relevant times, Mr. Barber was secured by shackles, and was heavily outnumbered by the Correctional Officer Defendants.

50.     At the time of the complained events, Mr. Barber had a clearly established right under the Maryland Declaration of Rights to bodily integrity and to be secure in his person from excessive force.

51.     Moreover, after the subject attack, Mr. Barber had a clearly established right to be free from actions that were not rationally related to a legitimate non-punitive governmental purpose, or from actions that appear excessive in relation to that purpose.

52.     Any reasonable correctional officer or supervisor knew or should have known of these rights at the time of the complained of conduct.

53.     The Correctional Officer Defendants used deadly force against Mr. Barber that it could have caused death and did cause serious bodily injury.

54.     The acts or omissions of the Defendants were direct causes of Mr. Barber's injuries.

55.     The acts or omissions of the Defendants described herein deprived Mr. Barber of his rights under the Maryland Declaration of Rights and caused him other damages.

56.     Each Defendant at all times relevant hereto was acting pursuant to State of Maryland and DPSCS custom, authority, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions toward Mr. Barber.

57.     As a direct and proximate result of the Defendants' conduct, Mr. Barber has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages.

58.    As a further result of the Defendants' conduct, Mr. Barber has incurred special damages, including medical related expenses, and may continue to incur further medical and other special damage related expenses.

59.    Mr. Barber is therefore entitled to money damages to compensate him for his injuries and for the violation and deprivation of his rights under the Maryland Declaration of Rights.

**WHEREFORE,** Mr. Barber prays for judgment in his favor and against all Defendants in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), plus costs, and such other relief that the Court deems appropriate.

## COUNT IV
### Negligent Hiring, Training, and Supervision
### (Against Warden Wolfe and DPSCS)

60.    Plaintiff hereby incorporates Paragraphs 1 through 59 as if fully set forth herein.

61.    At all relevant times to this action, Warden Wolfe was an employee of the State of Maryland acting within the scope of his employment as Warden Wolfe was responsible for overseeing the Correctional Officer Defendants and for maintaining a lawful environment at JCI.

62.    DPSCS had a duty to use reasonable care in hiring, training, and retaining the State Correctional Employees, including all individual Defendants in this action.

63.    Warden Wolfe had a duty to use reasonable care in retaining and supervising employees at JCI, including the Correctional Officer Defendants.

64.    On information and belief, Warden Wolfe had actual knowledge of the Defendant Correctional Officers' violent tendencies and past extrajudicial conduct involving prisoners at JCI.

65.     On information and belief, DPSCS, its agents, servants, and employees, had actual knowledge of the environment maintained by Warden Wolfe at JCI, which permitted an unreasonable risk of injury to prisoners like Mr. Barber.

66.     Despite this knowledge, DPSCS, together with its agents, servants, and employees ignored the lawless and ruthless environment maintained at JCI, which environment encouraged, or at least tacitly authorized, retaliation against prisoners by the Correctional Officer Defendants.

67.     On information and belief, DPSCS, together with its agents, servants, and employees, had actual knowledge of the Correctional Officer Defendants' violent tendencies and past disciplinary infractions involving prisoners at JCI and elsewhere in the state correctional system.

68.     As described herein, on information and belief, Warden Wolfe ignored these tendencies and patterns the Correctional Officer Defendants believed they could perpetrate the subject attack without consequence because they knew that the JCI leadership had historically looked the other way.

69.     A reasonable employer and/or supervisor would not have ignored these violent tendencies and the unreasonably risks of injury at JCI.

70.     DPSCS, together with its agents, servants, and employees knew or should have known that patterns the Correctional Officer Defendants would attack Mr. Barber; or at a minimum, that retaliation against Mr. Barber was a definite and real concern.

71.     Despite this knowledge, Warden Wolfe failed to adequately supervise and train his officers, supervisors, and other state-employed personnel at JCI.

72.     DPSCS negligently trained, hired, retained, and supervised JCI staff, including but not limited to, all individual Defendants in this action.  These failures caused Mr. Barber's injuries and damages.

**WHEREFORE,** Mr. Barber prays for judgment in his favor and against Defendants, Warden Wolfe and DPSCS, in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) as compensatory damages, plus costs, and such other relief that the Court deems appropriate.

**COUNT V**
**Negligence**
**(Against Warden Wolfe and DPSCS)**

73.     Plaintiff hereby incorporates Paragraphs 1 through 72 as if fully set forth herein.

74.     Warden Wolfe and DPSCS owed a duty of reasonable care to Mr. Barber to protect him against known risks of harm.

75.     Warden Wolfe and DPSCS knew of the Correctional Officer Defendants' violent tendencies and past disciplinary infractions toward prisoners at JCI.  Warden Wolfe and DPSCS also knew that JCI was an environment where correctional officers regularly took matters into their own hands as a form of vigilante justice.  In sum, Warden Wolfe and DPSCS knew that prisoners, like Mr. Barber, faced an unreasonable risk of physical harm at the hands of correctional officers.

76.     As described herein, Warden Wolfe and DPSCS breached this duty by ignoring this vigilante behavior, or by failing to intervene after becoming aware of same.

77.     These failures caused harm to the Mr. Barber.

**WHEREFORE,** Mr. Barber prays for judgment in his favor and against the Defendants, Warden Wolfe and DPSCS, in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), plus costs, and such other relief that the Court deems appropriate.

Respectfully submitted,


_____ /s/ *Allen E. Honick* _____

**David Daneman (CPF: 8912180145)**
**Allen E. Honick (CPF: 1612130266)**
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven Saint Paul Street, 14th Floor
Baltimore, Maryland  21202
410.659.6420 Office
410.223.4179 Facsimile
ddaneman@wtplaw.com
ahonick@wtplaw.com
*Attorneys for Plaintiff, Charles Barber*


## DEMAND FOR JURY TRIAL

Plaintiff, Charles Barber, demands that the above-captioned matter be tried before a jury.


_____ /s/ *Allen E. Honick* _____

**Allen E. Honick (CPF: 1612130266)**


*11288941*